STATE OF VERMONT

ENVIRONMENTAL COURT

| | | |
|---|---|---|
| | } | |
| Appeal of Noble | } | Docket Nos. 118-7-03 Vtec and |
| 24-2-03 Vtec | | |
| | } | |
| | } | |

<u>Decision and Order</u>

Appellants Denise Noble, Chris Wasser, Gail Connors, Steven Connors, Melinda Cobb, Douglas Cobb, George Trendle, Martha Trendle, Ken Mitchell, Diana Mitchell, Suzanne Braunegg, William Braunegg, Deanna Dahlgren, Sean Jordan and Lauren Jordan appealed from a decision of the Planning Commission of the Village of Essex Junction granting site plan approval for a development of seven single-family homes off Hubbell's Falls Drive and Beech Street. The project proposal as appealed in Docket No. 118-7-03 Vtec superseded that proposed in Docket No. 24-2-03 Vtec, and the two appeals were consolidated. The parties did not address Questions 1 or 2 of the original Docket 24-2-03 Vtec Statement of Questions in the evidence at trial or in their memoranda, and did not state in writing whether those issues had simply been superseded by the second appeal. Those issues will not be further discussed in this decision.

Related Superior Court litigation concluded with a decision in October of 2004. A related Act 250 permit was appealed to the Environmental Board, which issued a stay of construction in May of 2004, and issued its decision granting the Act 250 permit with certain conditions on March 4, 2005. On March 9, 2005, Appellee-Applicants and the Village submitted a stipulation to change the application in three respects to conform with the conditions imposed by the Environmental Board's decision. Appellants submitted their objection to this stipulation in electronic form on March 29, 2005 and filed it on March 30, 2005. As all three changes to the application address factual concerns raised at trial, and could equally have been imposed by this Court as conditions in the present appeals, they are not beyond the scope of this proceeding and will be considered in connection with the analysis of the municipal requirements for site plan approval.

Appellants are represented by Stephanie J. Kaplan, Esq.; Appellee-Applicants William and Maryjean Kalanges are represented by Vincent A. Paradis, Esq.; the Village of Essex Junction is represented by David A. Barra, Esq. An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge. The parties were given the opportunity to submit written memoranda and requests for findings. Upon consideration of the evidence, and of the written memoranda and requests for findings filed by the parties, the Court finds and concludes as follows. All citations are to the Village of Essex Junction Land Development Code.

Appellee-Applicants William and Maryjean Kalanges own a 13.8-acre parcel of land with frontage on Hubbell's[1] Falls Drive and on Beech Street in the Residential-1 (R-1) and Flood Plain zoning districts of the Village of Essex Junction. The project property is located on both sides of Hubbell's Falls Drive. The approximately ten acres southerly[2] of Hubbell's Falls Drive, now containing Appellee-Applicants' residence, is a heavily wooded area now proposed for this development. The approximately three to four acres northerly of Hubbell's Falls Drive are proposed to remain undeveloped. All of the proposed development is located within the R-1 zoning district.

Appellee-Applicants have applied for site plan approval to develop the portion of the property southerly of Hubbell's Falls Drive for seven additional single-family house sites to be sold in land condominium ownership, for the purchasers to construct houses of up to five bedrooms and up to two stories in design. The houses may be constructed with garages which are anticipated to resemble the Kalanges three-car garage in size. The organizational and management documents governing the condominium association (which will include the Kalanges residence as well), including any limitations on land clearing beyond the house sites or any maintenance obligations for the proposed streets, infrastructures, or existing trees or other vegetation on site, have not been presented to the Court and were not yet in existence at the time of trial.

The proposed seven house sites are proposed to be developed in two phases. Phase I consists of four house sites with access over an extension of the existing private driveway from Hubbell's Falls Drive which now serves Appellee-Applicants' residence. As, after development, that former driveway would serve more than three houses, the segment of it from Hubbell's Falls Drive to the intersection with the driveways to serve those new house sites would qualify under §906.G as a private street and not as a private driveway. Appellee-Applicants have requested a waiver of the twenty-foot-wide pavement width required for a private street and propose that the Phase I private street be paved to a width of fifteen feet.

Phase II consists of three additional house sites with separate access from Beech Street. Appellee-Applicants have implicitly requested a waiver of the requirement of a single curb cut, see §705.D.1, 3, and 7, as well as for the twelve-foot-wide pavement width required for a driveway. §906.C.5. They propose that the driveway serving Phase II be paved to a width of fifteen feet. The driveway for the Phase II houses is proposed to run within the fifty-foot-wide area (between the Braunegg property and the Wasser/Noble property) subject to an existing easement for a paved pathway that provides pedestrian, bicycle, and emergency and maintenance vehicular access to the pool and tennis courts at the Countryside Homeowners' Association's community recreation area.

The site plan shows the building envelope for each proposed 5-bedroom house site and shows the clearing limits for the house sites, the two access roads, the driveways to the house sites, and the natural gas and municipal water and sewer lines and connections. It does not show the portion of the property on the north side of Hubbell's Falls Drive that is proposed to remain undeveloped. It does not show the easement for the Countryside recreation area access, but Appellee-Applicants propose to add that easement to any final site plan, as a condition of approval.

The existing conditions shown on the site plan show the existing tree line and three specific large pine trees, but do not otherwise show 'tree groupings' or other specific existing plant materials, and does not show the location of specific existing mature trees proposed to be saved. The site plan indicates the limits of proposed clearing for the house sites and for the driveway and private street; beyond those limits the existing trees are proposed to be saved. The site plan does not propose the planting of any street trees on the Hubbell's Falls Road frontage. Appellee-Applicants have implicitly requested a waiver of the requirements for planting street trees and for planting added landscaping beyond the maintenance of the trees outside the clearing limits. §719.

The site plan shows distances from the proposed house sites to the nearest property lines, although only by scale. All distances from the proposed building envelopes to the nearest property lines meet the setback requirements for the district.

The project site is surrounded by large residential developments. To the east is the 'Countryside in the Village' (Countryside) development of 253 single-family houses located on lots of approximately a third of an acre each in area, with addresses on Beech Street, Tamarack Drive, Countryside Drive, and Aspen. None of the houses in the Countryside development is as large as the five-bedroom houses with three-car garages anticipated to be constructed on the house sites in the proposed project. The entire neighborhood surrounding the Beech Street access is served by sidewalks on both sides of the public street. Individual driveways make a curb cut with the public street over the sidewalks.

To the south is Essex Park, composed of residential condominium units in multiple-unit buildings, with several buildings on a single lot. To the north, located off Locust Lane, is a development of carriage-style single-family units, with eighteen buildings on a single lot. To the west is the Fairview Farms development, consisting of 99 single family homes located on lots of approximately a third of an acre each in area, with addresses on Fairview Drive, Juniper Ridge Road, Hawthorn Circle and Sycamore Lane. All of the surrounding properties are in residential use, most of which are single-family or carriage-style houses, and some of which are in condominium or similar ownership.

During the construction of the project, Appellee-Applicants propose to limit the hours of construction to the hours of 7:00 a.m. to 6:00 p.m. Monday through Friday and

8:00 a.m. to 5:00[3] p.m. on Saturday.   No construction activity will be conducted on Sundays or holidays.

The intersection of the Phase I private street with Hubbell's Falls Drive will contain no obstructions such as fences, walls, screens, signs, structures or foliage between the heights of 30 inches and 8 feet, within the thirty-foot visibility triangle area, measured for a distance of thirty feet along the street and along the Phase I private street, as defined by §710.B[4], if the foliage is cut as required by that section and the "TV Pedestal" shown in the plans is moved outside the visibility triangle or if it falls within one of the exceptions in §710.D.

The intersection of the proposed Phase II driveway with Beech Street will contain no obstructions such as fences, walls, screens, signs, structures or foliage between the heights of 30 inches and 8 feet, within the ten-foot visibility triangle area, measured for a distance of ten feet along the street and along the driveway, as defined by §710.C. However, due to the curve of Beech Street to the south of that intersection and due to the heavy use of the adjacent pathway to the recreation area, especially by children, visibility from that driveway will not be adequate unless on-street parking is prohibited on the westerly side of Beech Street for twenty feet on both sides of the new Phase II driveway.

The Beech Street driveway to serve the three house sites proposed for Phase II of the development is proposed to be located adjacent to the relocated paved access path

serving the pool, tennis courts, and recreation area of the Countryside Homeowners Association, Inc., within the fifty-foot-wide easement benefitting the recreation area. The existing recreation area access path is used primarily by pedestrians, including those using roller skates, skateboards, scooters, and strollers as well as by bicyclists and presumably for those traveling by wheelchair. It is heavily used by children, both with and without parental supervision. Even with parental supervision, children often run ahead of their parents in this recreational context. The degree of use on any given day of course depends on the weather, day of the week, and school schedule. The present recreation area access path is primarily designed for pedestrian use but is also used occasionally for access to the pool and tennis courts by maintenance vehicles and is accessible if necessary by emergency vehicles. The present access path is chained off to prevent other vehicular use; children often play on or about the chain, and ride their bicycles and use skateboards, skates and scooters on the path.

The recreation area is used year-round for walking and playing; is more heavily used from the late spring into the fall for walking and playing, as well as tennis; and is most heavily used between the Memorial Day and Labor Day weekends of each year when the pool is also open for use. Although the pool is supervised by a lifeguard from noon to 8:00 p.m., it is available for use in the mornings without lifeguard supervision.

Appellee-Applicants propose to relocate the pathway serving the recreation area within the easement area as a ten-foot-wide paved pathway located five feet from and parallel to the Braunegg property line to the south.  Appellee-Applicants also propose to install a parallel two-way driveway within the easement area, as a fifteen-foot-wide paved driveway located five feet from and parallel to the Wasser/Noble property line to the north, to serve the three houses in Phase II of the proposed development.  No landscaping was proposed within the setbacks on either side, or between the Phase II driveway and the recreation area pedestrian access.

Appellee-Applicants propose to install signs within the Phase II driveway near and facing Beech Street, stating "Private Property, Do Not Enter."  To conform with their recently-issued Act 250 permit, they also propose[5] to install at least one speed hump within the Phase II driveway designed to slow any exiting traffic as it approaches the sidewalk, and to install a stop sign within the Phase II driveway to stop any exiting traffic at the intersection of the Phase II driveway with the sidewalk.

The recreation area pedestrian access and the proposed Phase II driveway are proposed to intersect approximately ten feet from the sidewalk, within the property, and to share a driveway proposed to be about 25 feet wide at the sidewalk, widening to approximately 35 feet wide at the street.  Vehicular access to the recreation area

pedestrian pathway is proposed to be controlled by a chain running across that pathway a short distance down the pathway from the sidewalk.

Pedestrian traffic using the recreation area pedestrian access was initially proposed to be separated from the vehicular traffic using the Phase II driveway by a wood guardrail running close to and along the northerly side of the recreation area pedestrian access, extending beyond the recreation area entrance along the edge of the recreation area to the steep slope at the westerly boundary of the recreation area. At trial several alternate proposals were made to the Court to separate the recreation area pedestrian access from the proposed Phase II driveway. One proposal was to replace the guard rail with a 4-foot-high picket fence in the same location, extending back the same distance. Another proposal made at trial, to improve visibility between the recreation area pedestrian access and the Phase II driveway, was to replace the guard rail with a 4-foot-high chain link fence in the same location, extending back the same distance. To conform with their recently-issued Act 250 permit, Appellee-Applicants also now propose that the chain link fence be increased in height to six feet. As well as any of these proposed fences, at trial Appellee-Applicants also proposed to add a short segment of sidewalk from the existing Beech Street sidewalk to connect with the recreation area pedestrian access beyond the chain controlling vehicle access.

Appellee-Applicants have also installed a 6-foot-high wooden stockade fence along the boundary of the property with the rear boundaries of the lots along Beech Street and Hubbell's Falls Drive, so that the rear side of the fence faces the adjacent properties. No plantings have been proposed in connection with this fence to soften the effect of the fence on the adjacent properties.

Question 3: Development of multiple houses on a single parcel in the R-1 district

The Residential-1 zoning district is intended for relatively large[6] lot single-family residential development. The Land Development Code provides not only for conventional developments of single houses each on its own lot, but also for other types of ownership such as condominium ownership. A development of multiple house sites on a single parcel, intended for development as a land condominium, is treated as a subdivision under §503 regardless of whether the lots are to be divided and owned in fee, or whether the house sites are to be held in condominium ownership as in the present proposal, as the term "subdivision" is defined in §201.C.180 as property divided into two or more "lots, parcels, sites, plots or interests for the purpose of offer for sale, lease or development." It therefore requires subdivision approval under §503.

Because it is proposed as land condominium ownership, rather than conventionally-owned lots, and because waivers are requested at least the pavement width and curb cut

requirements of Chapter 9, it must be reviewed as a Planned Development. §§917.A.6 and 724.B. As a development activity involving more than a single one-family or two-family dwelling, it also requires site plan approval under §502.I.2; this is the application before the Court.[7]

The project proposes no innovative land or building design techniques, other than placement of the building sites to avoid encroachment on wetlands, and the land condominium form of ownership. Accordingly, it must meet the standard density and other requirements of the district under §724.A and .B. While the property on the northerly side of Hubbell's Falls Drive may be included in the overall development proposal for the project, it is separated from the southerly portion of the property by a public street. Because that land could not have been included in any conventional lots on the southerly (development) parcel, it cannot be included in the density calculations for the development parcel. Nevertheless, the land southerly of Hubbell's Falls Drive amounts to approximately ten acres, or over one acre per house, which exceeds the district requirement of 15,000 square feet (approximately a third of an acre) per house.

The proposal also meets the lot coverage, setback, and parking requirements for the R-1 zoning district. All of the building envelopes are located a minimum of 45' from the property lines. Single-family houses are a permitted use in the district; the houses

that may be constructed are to be limited to five-bedroom single-family houses with no more than two stories, and may have accessory garages up to a three-car capacity.

However, to comply with §§ 709.A.1 and 2, Appellee-Applicants must submit documentation to ensure the continued maintenance of and snow removal from of the Phase I private street.  Similarly, to comply with §511.C.5(c)(3),[8] Appellee-Applicants must submit "specification of ownership and responsibility for maintenance of such commonly-owned features" as common open space or common improvements.  Similarly, to comply with §719.D.3.(b), Appellee-Applicants must submit documentation of the entity responsible for maintenance of all landscaped areas, or, in a case such as this proposal in which a waiver is requested to allow existing trees and other vegetation to substitute for planted landscaping, the homeowners' association or other entity responsible for that maintenance on the commonly-held land.

Question 4: Adequacy of Site Plan Application - §§502.I.3 and 719.B

The proposed site plan contains all the elements required to be submitted by §502.I.3 and 719.B, except those discussed as follows.

Section 502.I.3(d) requires the site plan to include a survey of the property which shows existing or proposed rights of way and easements.  A survey of the portion of the property southerly of Hubbell's Falls Drive is incorporated in the site plan.  However, the

site plan does not include a survey of the portion of the property northerly of Hubbell's Falls Drive, and does not show the existing undisputed easement in favor of the Countryside Home Owners Association, Inc., for ingress and egress only over a 50' strip of land which is also proposed to be used for access to Phase II of the project from Beech Street.  Both these features must be supplied for the site plan to be approved.

Section 502.I.3(e) requires the site plan to show the "total land area and location, size, height, and number of stories of all existing and proposed structures and the distance from all structures to the nearest property line.  The site plan shows the land to the south of Hubbell's Falls Drive and the location and number of stories of the existing Kalanges house, and shows the location, maximum size and number of stories of the proposed structures, and by use of the scale on the site plan, shows the distance from all structures to the nearest property lines.  Any 'proposed structures' have not yet been designed, as they will be built by the purchasers of the house sites rather than by the developers of this project;  accordingly, it is sufficient for the site plan to show that they will be restricted to two stories in height.  As discussed above, the site plan fails to show the land to the north of Hubbell's Falls Drive, which must be shown as it is part of the proposed project.

Sections 502.I.3(i) and (j) require the site plan to identify existing natural features, including wetlands, rock outcroppings, and tree groupings and to include a detailed landscape plan by a landscape design professional, showing the "type, size, quantity and

location of all plant materials, existing and proposed." This requirement must be read together with §719.B, which requires the plan to indicate the location of existing mature trees, or tree groupings, and to indicate the trees or tree groupings that are proposed to be saved. The site plan shows wetlands, ledge outcroppings, the edge of the existing treeline, and three specific mature pine trees. While the site plan does state that the clearing of trees shall be limited to the clearing limits noted around each proposed house site and the proposed driveways and utility routes, it does not make any statements regarding the maturity of the trees within the existing forested site. By proposing to preserve much of the forested site, Appellee-Applicants implicitly request a waiver. Certainly nothing in the Code requires the developers of a forested site to cut down the forest in order to comply with a minimum landscaping requirement. However, §719.B does not provide for a complete waiver of landscaping, but only a credit of up to 50% of the required landscaping. In order to obtain such a credit, Appellee-Applicants must at least provide a statement about the proportion of mature trees within the forested area, and a plan or proposal for preserving them, through a management plan or other mechanism for maintaining the forested site. Moreover, the site plan contains no proposal for the landscaping or maintenance of the open space parcel northerly of Hubbell's Falls Road, nor does it provide for or request a waiver of the requirement to plant street trees on the Hubbell's Falls Road frontage.

Questions 5, 7 and 8: Compatibility with neighborhood, impact on traffic generation, impact on public health, safety and welfare (§502.I.4)); visibility at intersections and driveways for pedestrian and vehicular traffic (§710); and §705 standards for curb cuts and access as applied to the Phase II driveway.

The neighborhood is characterized by residential developments, most of which are smaller houses on smaller lots in a more suburban configuration than is proposed for the project houses. The proposed development will have a lower density than the surrounding properties, and be located in a more wooded area. Although the houses are proposed to be larger in size, they will be restricted to a height of no more than two stories and a size and style similar to Appellee-Applicants' existing house. The proposed development is compatible with the neighborhood.

The project has adequate accessibility for fire and rescue vehicles to the project property. Fire hydrants are available on both Hubbell's Falls Drive and Beech Street. The proposed project is adequately served by municipal water supply and sewage disposal.

The proposed project is calculated to generate approximately 70[9] to 95 vehicle trips per day to be added to the surrounding roadways. The peak hour traffic on the surrounding roadways occurs from 7:15 to 8:15 in the morning and from 4:30 to 5:30 in the afternoon. A total of approximately 53[10] vehicle trip ends per weekday can be

anticipated to be generated on Hubbell's Falls Drive from the proposed houses' use of the Phase I private street. Hubbell's Falls Drive now carries approximately 385 vehicles during an average November weekday, including those from the existing Kalanges house, with 36 vehicles using it in the morning peak hour and 45 vehicles using it in the afternoon peak hour. Approximately thirteen of the trips to be generated by the proposed project on Hubbell's Falls Drive can be anticipated to be generated in the morning peak hour and approximately eight in the evening peak hour. A total of 42 vehicle trip ends per weekday can be anticipated to be generated on Beech Street from the houses using the Phase II driveway, with 12 of those trips being generated in the morning peak hour and five in the evening peak hour.

Both Hubbell's Falls Drive and Beech Street, and the other connecting roads in the area have adequate capacity to handle the estimated vehicle trips to be generated by these houses, regardless of whether the lower or higher trip generation numbers are used.

The ordinance requires the Court to examine not only the traffic generation of the proposed project, but also the effect of those vehicle trips in terms of safety for vehicles and pedestrians using the surrounding streets and sidewalks. §502.I.4.

The waiver of reducing five feet from the 20-foot-wide pavement width for a private street is warranted to ensure that two-way travel remains adequate, while

preventing excessive speed on the Phase II private street, especially at the approach to Hubbell's Falls Drive.

The sight distances of 480 feet to the east and 420 feet to the west at the Hubbell's Falls Drive intersection of the Phase I private street are adequate at the posted speed limit of 25 miles per hour, and remain adequate at 30 miles per hour. The sight distances of 300 to 400 feet to the south and 1000 feet to the north at the Beech Street intersection of the Phase II driveway are only adequate in the absence of vehicles parked on the west side of Beech Street within approximately twenty feet of that intersection.

The intersection of the Phase I private street with Hubbell's Falls Drive will meet the thirty-foot visibility triangle requirement of §710.B, if the foliage is cut as required by that section and the "TV Pedestal" shown in the plans is moved outside the visibility triangle (unless it falls within one of the exceptions in §710.D). The intersection of the proposed Phase II driveway with Beech Street will meet the ten-foot visibility triangle requirement of §710.C. However, due to the curve of Beech Street to the south of that intersection and due to the heavy use of the adjacent pathway to the recreation area, especially by children, visibility from that driveway will not be adequate to protect public safety and welfare unless on-street parking is prohibited on the westerly side of Beech Street for twenty feet on both sides of the new Phase II driveway.

Placing the recreation area access in association with the proposed Phase II driveway will not be adequate to protect public safety and welfare, particularly of children using the recreation area, unless the two functions are effectively separated. Not only must they be effectively separated all the way to the rear property line of the recreation area, so that users of the recreation area will not use the Phase II driveway as an alternate route to the recreation area, but there must be sufficient visibility on the approach to Beech Street to enable drivers to see, stop for, and avoid pedestrians (including children on skateboards and scooters) and bicyclists and to enable pedestrians and bicyclists to see and avoid approaching vehicles. Before discussing whether any version of the proposed fence achieves that goal, we must first examine whether the two accesses as designed comply with the other requirements of the regulations.

The required side setback for the R-1 zoning district is eight feet. §613.C.2. In order to meet that setback, the recreation area pedestrian access and the proposed Phase II driveway must be moved six feet closer together, so that the side setbacks are each eight feet wide, and the strip separating the two is nine feet wide.

As proposed, the recreation area pedestrian access and the proposed Phase II driveway intersect approximately ten feet from the sidewalk, within the property. From that point to the curb, they share a driveway which is approximately 25 feet wide[11] at the sidewalk, widening to approximately 35 feet wide at the street. However, the recreation

area pedestrian access does not in fact constitute a third traveled vehicle lane at the street. Rather, it is a pedestrian pathway that must be suitable for occasional travel by maintenance and emergency vehicles, which obtain access to it if necessary from the proposed Phase II driveway by removing the chain that otherwise restricts vehicles from traveling on it.

The proposed Phase II driveway is 15 feet wide, so as to accommodate two-way driveway traffic. The waiver of allowing an additional three feet to be added to the 12-foot-wide pavement width for a driveway is warranted to ensure that all traffic will be able to exit from the driveway facing forward, and to avoid conflict when a maintenance or emergency vehicle is entering or exiting the pedestrian pathway. The recreation area pedestrian access is paved to a ten-foot width, to provide for pedestrian, bicycle, stroller, wheelchair, rollerblade, skateboard and scooter access, and to enable occasional maintenance and emergency vehicles to reach the recreation area.

Even if the width of the curb cut should be calculated in the same way as a multi-family dwelling, because it serves three houses rather than the one or two addressed in §705.B.1, it only serves two traffic lanes, and therefore should meet the standards of a 20 to 25 foot curb cut. Although that is a minimum standard, in the present circumstances a wider curb cut decreases safety rather than increasing it. Instead, the very wide curb cut creates a larger undefined area within which adults and children using the recreation area

access path could conflict with or be confused by the turning movements of vehicles turning into the Phase II driveway.  Rather, the curb cut should be reduced in width to carry the 15-foot width of the Phase II driveway to the sidewalk, broadening out to a 20-to-25-foot-wide curb cut with the required radii.  The recreation area pedestrian access could then meet the Phase II driveway at its ten-foot width, so that the chain limiting traffic from that pathway would more clearly define the edge of the Phase II driveway.  (See diagram attached as Appendix A).

If the driveway were reconfigured and the six-foot-high green vinyl chain link fence were installed as now proposed, it would accomplish both goals.  It would adequately separate the flow of pedestrians (including children) traveling to and from the recreation area from the vehicles using the Phase II driveway.  It would improve visibility between the recreation area pedestrian access and the Phase II driveway sufficiently far back from the junction of the two traveled ways so as to enable both drivers and pedestrians to perceive and adjust to the other to avoid conflict.  Moreover, it would better define the vehicular and the pedestrian paths of travel[12] so that drivers new to the intersection, such as drivers of delivery vehicles, could accurately recognize their appropriate traveled lane and the unusual configuration of the intersection.

At trial Appellee-Applicants also proposed to add a short segment of sidewalk from the existing Beech Street sidewalk to connect with the recreation area pedestrian access

beyond the chain controlling vehicle access. Such a sidewalk segment will be useful to connect the sidewalk to the pathway and to clarify that the recreation area pedestrian access is not part of the street and vehicular access system, but instead is part of the pedestrian and sidewalk circulation system. In adjusting the design of the curb cut, Appellee-Applicants should consider adjusting the shape and location of the additional sidewalk segment, to encourage its use for pedestrians approaching from both directions along Beech Street.

Question 9: Storm Water Management (§713)

The proposed development does not result in substantial alterations to topography and does not result in a substantial increase in the impervious area, and therefore does not require a stormwater management plan under §713. The proposed project does not require a state stormwater permit because the total impervious area on the site is less than two acres. The post-development peak runoff rate is a minimal 5% increase. The project design makes provisions to attenuate the runoff from individual house sites with stone interceptor trenches located at the downgradient side of the construction envelopes, so that the stormwater flow is conducted to grassed sedimentation swales with 2% or less slope for both access drives and is conducted to overland sheet flow across lawns of 5% or less slope, and to stone interceptor trenches where applicable. Water runoff treatment

complies with best management practices. The infiltration capabilities of the site are maximized through overland flow and existing dense vegetation uptake, to reduce both runoff volume and peak discharge, in compliance with §713.

Question 10: Creation of any dangerous, injurious, noxious or otherwise objectionable conditions (§718.A)

The performance standards in §718 must be complied with by all uses during their operation, not only in assessing a permit application. The project consists of adding seven houses to the area, which are not expected to generate objectionable noise, odor, smoke, or hazardous materials.

To the extent that this question was intended to address noise during construction, the proposed limits on the hours of construction of 7:00 a.m. to 6:00 p.m. Monday through Friday and 8:00 a.m. to 5:00 p.m. on Saturday, with no construction activity occurring on Sundays or holidays, are reasonable to prevent objectionable noise during the site work.

To the extent that this question was intended to address blasting during site work, the site plan shows that ledge or rock outcroppings occur on the property and are anticipated to require removal by blasting. Any blasting activities will be conducted by a blasting contractor in accordance with all applicable federal and state regulations, including

the preparation of a pre-blast survey of neighboring properties and structures (which include the recreation area pool, tennis courts and associated buildings) and a blasting plan. As a condition of site plan approval, Appellee-Applicant shall also provide notification in writing or by other agreed means (such as email) to the owners of all adjoining properties at least 24 hours in advance of any planned blasting.

Question 11: Sufficiency of landscaping (§719)

The portion of the property to the south of Hubbell's Falls Drive is heavily wooded. As discussed above, in order to qualify for the 50% waiver provided in §719, Appellee-Applicants must provide a statement about the proportion of mature trees within the forested area, and a plan or proposal for preserving them, through a management plan or other mechanism for maintaining the forested site, as well as with the required specification of ownership of the common areas and responsibility for their maintenance required by §511, so that the owners' association will be able to tell which forestry practices are acceptable beyond the house site clearing limits, and which are not. Appellee-Applicants also must provide a description of and proposal for the landscaping or maintenance of the open space parcel northerly of Hubbell's Falls Road. Appellee-Applicants also must provide for or request a waiver of the requirement to plant street trees on the Hubbell's Falls Road frontage.

With respect to the adjacent properties, Appellee-Applicants must provide a landscaping plan for the eight-foot side setback areas adjacent to the Braunegg and Wasser/Noble properties, to protect and enhance those properties in connection with the relocation of the recreation area pedestrian access and the new Phase II driveway. Similarly, the the 6-foot-high perimeter stockade fence, by itself and without any associated plantings to soften its effect on the back yards of the adjacent smaller lots on Beech Street and Hubbell's Falls Drive, fails to meet the requirement of §719.D to insure protection of and enhance the quality both of the project in question and of adjacent properties. If property now proposed for development has not been dedicated to public open space,[13] Appellee-Applicants are entitled to protect the new house sites from use as public open space, but they must do so in a way that also protects and enhances the adjacent properties.

Question 6: Appropriate conditions and safeguards with respect to the adequacy of traffic access, of circulation and parking, of landscaping and screening, and protection of the utilization of renewable energy resources (§ 502.I.5)

The proposed project does not implicate the protection of the utilization of renewable energy resources, as any availability of solar or wind power on the site or on neighboring property is already governed by the existing vegetation, which is to be preserved.

All the remaining appropriate conditions and safeguards with respect to the adequacy of traffic access, of circulation and parking, and of landscaping and screening have been discussed above. With the imposition of those conditions and safeguards, the proposal will meet all the requirements for site plan approval.

Based on the foregoing, it is hereby ORDERED and ADJUDGED that site plan approval of Appellee-Applicant's proposal is GRANTED, subject to the following appropriate conditions and safeguards, and subject to the provision of the following documents and their approval, if necessary,[14] as amendments to this site plan.

1. Provide a site plan based on a survey for the portion of the property north of Hubbell's Falls Drive, together with a landscaping and/or maintenance plan for that portion of the property, and the entity and documentation of the ownership and responsibility for maintenance of that portion of the property.

2. Show on the final site plan the easement relating to access to the Countryside recreation area.

3. In lieu of showing specific mature trees or groups of trees on the site plan, due to the heavily wooded nature of the property, provide a report describing the maturity of the trees in the areas designated as beyond the clearing limits and a plan for maintenance and preservation of those areas.

4.  Provide the entity and documentation of the ownership and responsibility for maintenance of the common areas and the landscaping and preserved existing vegetation in Phase I and Phase II, and for maintenance and snow removal on the private street and driveways.

5.  Revise the portion of the plan and any detail sheets relating to the Beech Street Access to show the speed hump or humps, the placement of the stop sign, the correct eight-foot-wide side setbacks, the 6-foot green vinyl-coated chain-link fence extending to the rear of the recreation area property, the revised placement of the chain controlling vehicular access, the revised curb cut width, and any proposed additional revisions to the placement or geometry of the driveway curb cut or the sidewalk extension segment.

6. Provide a landscaping plan for the area within the eight-foot-wide side setbacks at the Beech Street Access.

7.  Obtain permission[15] from the appropriate governing body to prohibit parking on the west side of Beech Street for twenty feet to either side of the edge of the Beech Street curb cut, and install the signage and pavement striping necessary to establish that no-parking zone.

8.  Provide a landscaping plan for the area between the privacy fence and the back property lines of the adjoining single-family residential properties, which may include moving or redesigning the privacy fence.

9. Address the planting of or waiver of the requirement for street trees on the Hubbell's Falls Drive frontage, and the relocation of the TV pedestal, if necessary to meet the visibility triangle requirements at that location.

10. In carrying out any blasting plan, provide at least 24-hour notice to the adjoining property owners of any planned blasting event.

In view of the complexity of this decision and the need for revisions in the site plan documents in connection with this approval, on or before April 19, 2005, Appellee-Applicants shall submit a proposed judgment order with a revised site plan and revised detail sheets consistent with this decision, approved as to form by the other parties.

Dated at Berlin, Vermont, this 4th day of April, 2005.

_____
Merideth Wright
Environmental Judge

---

[1] The spelling of this street appears in the evidence both with and without the apostrophe.

[2] The directions are taken from the site plan, which contains a directional arrow showing north to the right side of the page, not at the top.

[3]  From the testimony of the project engineer at trial.

[4]  Sections 710.B and C require a ten-foot visibility triangle where a driveway intersects with a public street, and require a thirty-foot visibility triangle on any "corner lot," which is defined a lot "abutting two or more intersecting public or private streets." §201.C.104.

[5]  The location of the proposed speed hump or humps and the proposed stop sign would have to be added to any site plan as they were not shown in the original site plan or as attachments to the March 9, 2005 stipulation.

[6]  The minimum lot size for the R-1 district is 15,000 square feet, or just over a third of an acre.  "Large" lot in this context is evidently a relative term, but the minimum lot size in this district is twice that of the minimum lot size in the R-2 residential district, the purpose of which is "high-density" single family residential development.

[7]  Under §503.F, applications for subdivision review, site plan review, and planned development review may be reviewed in one proceeding by the Planning Commission and hence this court.  However, the parties have presented this appeal as only relating to site plan approval for the proposed project.

[8]  On page 54 of the Code, apparently misnumbered, as it appears that the correct numbering should have been §511.D.3(c), because 'preliminary development plan' and 'final development plan' are not subsections of 'conceptual plan.'

[9]  We note that at trial the project engineer used a rule-of-thumb estimate of ten vehicle trips per new house, and Appellants' traffic expert agreed with that estimate. However, Appellee-Applicant's Exhibit 9 shows a calculated weekday estimate of 13 to 14 trips per day for each of the new houses.

[10]  Exhibit 9 shows the trip generation equations for five houses using Hubbell's Falls Drive: the existing house plus the four proposed houses.  To avoid counting the Kalanges

house twice (once in the existing traffic and once as part of the project generation), we have adjusted those figures downwards as approximations of the numbers that would be calculated by the equations for the trip generation figures in Exhibit 9.

[11]  The details of that access provided as Exhibits 11, 12, and 13 are to an actual scale of 3/4" = 20', not the 1" = 20' as stated.  That is, the 10-foot-wide pedestrian path measures 3/8" on the plan.

[12]  There was no testimony regarding the utility of differently colored surfacing material or specially embossed asphalt to aid such visual separation; however, nothing in this decision precludes the use of such techniques.

[13]  Questions of whether that property was dedicated to public or open space use in connection with a previous development covenants and, if people have commonly used it for walking or other recreation in the past, whether any easements have arisen by operation of law, are issues that would have to be addressed in superior court.  This court can only determine whether the proposed project meets the standards in the Land Development Code and any requirements of other municipal permits.

[14]  This decision does not address whether the consideration of the missing information by the Planning Commission should be classified as a minor or a major amendment under §502.I.10.

[15]  Any failure to obtain this permission shall be reported promptly to the parties and to Village of Essex Junction zoning and planning officials, together with any proposal for substitute safety measures for visibility at this location.